UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WALTER WILLIAM MOORE, a/ka<br>Nikki Natasha Petrovickov, | )<br>)<br>) | |
| Plaintiff | )<br>) | |
| v. | )<br>) | 1:16-cv-00398-NT |
| MAINE DEPARTMENT OF<br>CORRECTIONS, et al., | )<br>)<br>)<br>) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff, an inmate at the Maine State Prison, alleges Defendants did not provide adequate treatment for gender dysphoria. (Complaint at 3 – 4, ECF No. 1.) The matter is before the Court on the Motion for Summary Judgment of Defendants Magnusson, Fitzpatrick, Merrill, and Liberty, officials or former officials of the prison. (ECF No. 133.) Following a review of the summary judgment record and after consideration of parties' arguments, I recommend the Court grant Defendants' motion for summary judgment.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with

respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the Plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

### SUMMARY JUDGMENT RECORD

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record. Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend. A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules.[1]

---

[1] "[T]he Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to

2

*Ruiz Rivera v. Riley*, 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement. D. Me. Loc. R. 56(b). A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). If an additional statement is introduced by the non-moving party, the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence. D. Me. Loc. R. 56(d).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent

---

avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases.'" *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

3

duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

Nevertheless, the factual assertions contained in the verified pleadings and affidavits filed by a pro se litigant generally will be considered in the review of a summary judgment motion. That is, where a pro se litigant has failed to comply strictly with the summary judgment rules, this Court has considered the sworn assertions of record. *See Clarke v. Blais*, 473 F. Supp. 2d 124, 128 – 30 (D. Me. 2007) ("The First Circuit has not addressed this notice debate directly, but has said, in the summary judgment context, that unrepresented plaintiffs' opposing affidavits and opposition papers are to be read 'liberally.'" (citing *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988), and *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980)); *Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 – 83 (D. Me. 2007).

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff is a prisoner incarcerated at the Maine State Prison. Plaintiff identifies as a transgendered individual, born biologically a male but identifying as a female. (DSMF ¶ 1; PSMF ¶¶ 1, 2.) Prior to beginning a sentence in February 2005, Plaintiff was taking hormone medication to treat gender dysphoria. (DSMF ¶ 2; Complaint at 3.) The prison's medical personnel did not provide Plaintiff with hormone medication at the prison. (DSMF

---

[2] The following facts are drawn primarily from Defendants' statement of material facts. (ECF No. 132.) Plaintiff did not initially file a response to Defendants' factual statements; instead, Plaintiff filed an affidavit attesting to seven of Plaintiff's factual statements. (ECF No. 152-1). After Defendants noted Plaintiff's submission did not comply with the applicable procedural rules, Plaintiff substantially complied with Local Rule 56(c) in a sur-reply. (ECF No. 163). Accordingly, I will consider Plaintiff's responses to Defendants' statements of fact, and because I interpret Plaintiff's response affidavit to be Plaintiff's statement of material facts, I will consider the statements.

4

¶ 2; Complaint at 3.) In November 2008, Plaintiff was sent to the Riverview Psychiatric Hospital, where hormones were prescribed, but the prison's medical providers discontinued the hormones upon Plaintiff's return to the prison. (DSMF ¶ 3; Complaint at 3.) The Warden of the prison (Defendant Liberty) and the other security and administrative prison staff defer to the judgment of the Department of Corrections' contracted medical providers regarding the necessity of medical treatment and the type of treatment prescribed. (DSMF ¶ 10.)

In November 2015, the Department adopted Policy 23.8, "Management of Transgender and Intersex Prisoners and Residents." (DSMF ¶ 4.) The policy creates protocols for the assessment, placement, management and treatment of prisoners with gender dysphoria or who are transgender or intersex. (*Id.*) The policy establishes a multi-disciplinary team, including the chief administrative officer of the facility, security personnel, and medical and mental health providers. (*Id.*) The policy addresses issues such as housing and security concerns, strip searches, allowed property and clothing, and medical and mental health treatment. (*Id.*)

On December 3, 2015, pursuant to the transgender policy, a multi-disciplinary team was convened to provide recommendations regarding Plaintiff. (*Id.* ¶ 5.) The team discussed such topics as Plaintiff's assigned housing, Plaintiff's requests for cosmetics and female clothing, appropriate forms of address, and medical diagnosis. (*Id.*) Comprehensive minutes were kept at such meetings. (*Id.* ¶ 6). At the first meeting, the prison's medical director, Robert Clinton, M.D., advised that hormones had not been

prescribed for Plaintiff because Plaintiff did not have an underlying medical condition that required medical treatment.  (*Id.* ¶ 7.)

Similar multi-disciplinary team meetings were held on January 22, February 12, May 10, and June 30, 2016; February 2, June 15, and September 19, 2017; and January 11 and March 22, 2018.  (*Id.* ¶ 5.)  At one meeting, Daniel Bannish, a psychologist, reported that he had received records showing that Plaintiff had received hormone treatment in Massachusetts before entering the prison.  (*Id.* ¶ 8.)  Sarah Miller, also a psychologist, stated that Plaintiff did not meet the diagnostic criteria for gender dysphoria, but that she would reevaluate the issue as more information becomes available.  (*Id.*)

Plaintiff initiated this lawsuit on July 29, 2016, seeking damages and injunctive relief against the Maine Department of Corrections, the former Commissioner of the Department of Corrections, the former and current Wardens of the Maine State Prison, and two administrators of the prison's medical provider.  (Complaint at 1, ECF No. 1; DSMF ¶ 3.)  Plaintiff amended the complaint on October 13, 2016.  (ECF No. 24.)

At the multi-disciplinary team meeting on September 19, 2017, the doctors advised the other team members that Plaintiff had been diagnosed with gender dysphoria and that hormone treatment would be started.  (DSMF ¶ 9; PSMF ¶ 2.)  At the next meeting, on January 11, 2018, the team was advised that Plaintiff was receiving hormones, although Plaintiff was not satisfied with the type or dosage of the medication.  (DSMF ¶ 9.)

## DISCUSSION

A.  **Exhaustion of Administrative Remedies**

Plaintiff claims that Defendants improperly denied or discontinued Plaintiff's hormone medication. In addition to a claim for money damages, Plaintiff asks the Court to order Defendants to arrange for an assessment and treatment. (Complaint at 3.) Defendants contend Plaintiff failed to exhaust the available administrative remedies and, therefore, Plaintiff's claims for monetary damages and injunctive relief are barred.

Federal law requires a prisoner to exhaust the available administrative remedies before initiating a lawsuit based on 42 U.S.C. § 1983, or any other federal law. 42 U.S.C. § 1997e. Specifically, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA [Prison Litigation Reform Act] and that unexhausted claims cannot be brought in court.")

The Supreme Court has held that § 1997e(a) requires "proper exhaustion" of a prisoner's administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90 – 91. "Compliance with prison grievance procedures … is all that is required … to 'properly exhaust.'" *Jones*, 549 U.S.

at 218. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

A defendant may raise the § 1997e exhaustion requirement as an affirmative defense. *Id.* at 216; *see also Ramos v. Patnaude*, 640 F.3d 485, 488 (1st Cir. 2011) ("The Supreme Court made it plain … that exhaustion under § 1997e(a) is not a jurisdictional condition, and has held it to be an affirmative defense." (citing *Jones,* 549 U.S. at 212)). Because failure to exhaust administrative remedies is an affirmative defense rather than a jurisdictional issue, initially, Defendants bear the burden of proof. *Jones*, 549 U.S. at 216. To satisfy that burden, Defendants must establish "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino v. Baca,* 747 F.3d 1162, 1172 (9th Cir.) (en banc), *cert. denied sub nom.*, *Scott v. Albino,* 135 S. Ct. 403 (2014). Thereafter, Plaintiff must present evidence that demonstrates "that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

Exhaustion is required even though the prisoner's suit seeks monetary damages that are not available through the prison's grievance process. *Booth v. Churner*, 532 U.S. 731, 734 – 35 (2001). Exhaustion is also required even though the claim raises constitutional claims, such as claims alleging excessive force by prison officials. *Woodford*, 548 U.S. at 91 n.2; *Porter*, 534 U.S. at 520. However, "[a] prisoner need not exhaust remedies if they are not 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). Thus, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to

8

obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738).

In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* "First, … an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (citing *Booth*, 532 U.S. at 736, and providing as examples a situation in which a handbook tells prisoners to send a grievance to an officer who then "disclaims the capacity to consider the grievance," and a situation where "administrative officials have apparent authority, but decline ever to exercise it"). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, a process that, viewed objectively, is too confusing to understand, is not an available process. *Id.* Third, an otherwise available grievance process is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. [3]

The record establishes that the Maine State Prison has a grievance policy that provides for an initial attempt at informal resolution of a complaint with medical or mental health staff, a first-tier grievance with the facility's Grievance Review Officer, a second-

---

[3] In *Ross*, the Supreme Court remanded the case for further proceedings where the record suggested that the commencement of an investigation into prisoner abuse by the prison's Internal Investigation Unit cut off any further processing of the prisoner's related prisoner grievance and foreclosed his access to any relief through that process. 136 S. Ct. at 1860 – 62.

tier appeal to the Chief Administrative Officer of the facility and, ultimately, a third-tier appeal to the Commissioner of the Department of Corrections. (DSMF ¶ 11.) According to Plaintiff, "a number of requests and grievences, [sic] all grievences [sic] were appealed to the State Commissioner level." (Complaint at 2.) Defendants, however, have no record of any third-tier grievance appeals following the denial of hormone treatment to Plaintiff in 2005 or for the six-month following November 1, 2008.[4] (DSMF ¶ 12.) In addition, Plaintiff's assertion that after the 2005 hormone decision "I grievenced [sic] immediately and was shut down by Warden Merrill in middle '05," (Complaint at 3) suggests that Plaintiff's grievance did not proceed beyond the second level. On this record, one cannot reasonably conclude that Plaintiff exhausted the administrative remedies. To proceed on the claims, therefore, Plaintiff must demonstrate that the administrative remedies were not actually "available." *See Albino,* 747 F.3d at 1172; *Ross*, 136 S. Ct. at 1862 (asking whether there was "persuasive evidence" of threats, game-playing, or misrepresentations on a system-wide basis or in the individual case).

Plaintiff maintains that "there is a known pattern of obstructions of prisoners' 'grievance rights' by D.O.C. actors, plus, my own records have been 'disappeared' by D.O.C. actors." (PSMF ¶ 5.) Plaintiff also argues that the "standard operating procedure" of Department of Corrections officials is to obstruct the grievance process, and that "records are 'lost,' destroyed or stolen." (Plaintiff's Reply at 2, ECF No. 163.) While an administrative remedy could be deemed unavailable "when prison administrators thwart

---

[4] In the complaint, Plaintiff alleges the hormone treatments were provided at Riverview Hospital in November 2008, but stopped when Plaintiff returned to the prison. (Complaint at 3 – 4.)

inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," *Ross,* 136 S. Ct. at 1860, the record lacks any evidence to support such a finding. Other than Plaintiff's bald assertion regarding a pattern of obstruction, Plaintiff has not presented any evidence that Defendants made any misrepresentations about the grievance process, made any threats or otherwise intimidated Plaintiff, or destroyed any records.

The record thus establishes that Plaintiff failed to exhaust the available administrative remedies regarding the claims asserted in this matter.[5] Accordingly, Plaintiff's claims are barred.[6]

---

[5] Although the record suggests that Plaintiff is not satisfied with the course of treatment, "[t]he courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment" and the Eighth Amendment "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing." *Kosilek v. Spencer*, 774 F.3d 63, 82 – 83 (1st Cir. 2014) (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir.1993)). Therefore, to the extent Plaintiff asserts a claim based on a disagreement as to the appropriate course of treatment for gender dysphoria, Plaintiff has presented no evidence that would support a deliberate indifference claim regarding the course of treatment even if Plaintiff had satisfied the exhaustion requirement. *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991) (where a claim involves a dispute concerns the choice of a course of treatment, "deliberate indifference may be found where the attention received is so clearly inadequate as to amount to a refusal to provide essential care.")

[6] The exhaustion requirement applies "irrespective of the forms of relief . . . ." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001); *see also Cronin v. State*, No. CIV. 00-0129-P-C, 2000 WL 762206, at *1 (D. Me. May 12, 2000) (recommending dismissal of an action seeking only prospective relief for failing to exhaust). Plaintiff's claims for damages and injunctive relief, therefore, are barred. Even if Plaintiff's claims were not barred against all of the movants, Defendants Fitzpatrick and Liberty would nevertheless be entitled to summary judgment. Government officials are only liable for their own misconduct and are not liable under *respondeat superior*. *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). Plaintiff does not allege any specific wrongdoing by Defendants Fitzpatrick and Liberty. Plaintiff might have named Defendants Fitzpatrick and Liberty as defendants in their official capacities for the purposes of implementing Plaintiff's claim for injunctive relief. *See Poirier v. Mass. Dep't of Corr.*, 558 F.3d 92, 97 n. 6 (1st Cir. 2009) ("A plaintiff may seek prospective injunctive relief against a state official, but may not obtain such relief against a state or its agency because of the sovereign immunity bar of the Eleventh Amendment"). Summary judgment is still appropriate as to Defendants Fitzpatrick and Liberty, however, because that claim is moot. See *infra*.

## B. Prospective Relief and Mootness

Plaintiff also asks the Court to order an assessment and treatment for gender dysphoria. (Complaint at 3 – 4.) Even if Plaintiff's claims are not barred by the failure to satisfy the exhaustion requirement of the PLRA, Plaintiff's claim for prospective injunctive relief is moot.

An issue or a case is said to be moot when a court cannot give effective relief to the potentially prevailing party. *See Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992). A case or issue can be moot at the outset, or a case or issue "not moot at the outset can become moot because of a change in the fact situation underlying the dispute, making relief now pointless." *Horizon Bank & Tr. Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004).

Plaintiff's claim for prospective relief that Defendants assess Plaintiff and provide treatments for gender dysphoria "has become moot" because Plaintiff has been assessed and is now receiving hormone treatments. As the result of policy changes at the prison and medical determinations following the beginning of the parties' dispute, Plaintiff achieved the result requested, which means "there is no ongoing conduct to enjoin." *See Town of Portsmouth, R.I. v. Lewis*, 813 F.3d 54, 58 (1st Cir. 2016).

Although Defendants have arranged for the assessment and treatment of Plaintiff, Plaintiff could maintain a request for injunctive relief if the "voluntary cessation" exception to the mootness doctrine applied. "This exception can apply when a defendant voluntarily ceases the challenged practice in order to moot the plaintiff's case, and there exists a reasonable expectation that the challenged conduct will be repeated following dismissal of

the case." *Id.* at 59 (internal quotations, citations, and modifications omitted). The purpose of this exception is "to avoid a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013). Here, the record lacks any evidence to suggest that Defendants, having an established transgender policy and having determined that Plaintiff has a genuine medical need, would cease providing treatments after termination of this case. The "voluntary cessation" exception, therefore, does not apply, and Plaintiff's claim for injunctive relief is moot.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendants' Motion for Summary Judgment. (ECF No. 133.)

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 18th day of January, 2019.